IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 17, 2004

## STATE OF TENNESSEE v. JEREMIAH GINN

**Appeal from the Circuit Court for Warren County**
**No. F-9025    Larry B. Stanley, Jr., Judge**

---

**No. M2003-02330-CCA-R3-CD - Filed March 31, 2005**

---

A Warren County Circuit Court jury convicted the defendant, Jeremiah Ginn, of second degree murder, a Class A felony, and the trial court sentenced him to twenty-four years in the Department of Correction.  The defendant appeals, claiming that the evidence was insufficient to support his conviction; that the trial court erred in instructing the jury by referring to statements made by the defendant as "admission against interest;" by not repeating mens rea definitions for lesser included offenses; and by not including a charge on the doctrine of "mutual combat"; that the trial court erred in allowing the state to introduce certain photographs into evidence; and that his sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. THOMAS T. WOODALL, J., filed a separate opinion concurring in part and dissenting in part.

Dan T. Bryant, District Public Defender, for the appellant, Jeremiah Ginn.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Clement Dale Potter, District Attorney General; and Larry G. Bryant and Thomas J. Miner, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

This case relates to the defendant's killing Robert Webb on March 31, 2002.  At the trial, Jamie Webb, the victim's wife, testified that on the night of the murder, she arrived home from work to find the victim, the defendant, Allen Smith, Brent Breedlove, and Mr. Breedlove's girlfriend, Tina Ledbetter, sitting around, drinking, listening to music, and talking.  She said that after a while, the defendant and Mr. Smith left.  She said that later, she heard her husband arguing over the telephone with the defendant's sister.  She said that at the conclusion of the telephone call, her husband left to go into town, telling her to go to Brent Breedlove's house where he would meet her later.

On cross-examination, Mrs. Webb acknowledged that when she met the victim, he was living in Reno, Nevada, with the defendant and that the two men were best friends. She said that even after she married the victim, the defendant "was sort of part of the household" and like a brother to her and the victim. She said that because the victim had an easier time making money than the defendant, he would give the defendant money on a regular basis and that the defendant would repay the victim. She said she noticed the relationship between the victim and the defendant deteriorating in the year before the victim's death, but she did not know the reason for the deterioration. Mrs. Webb also acknowledged that the victim owned a handgun and a pair of brass knuckles. She said that when the victim left home after talking to the defendant's sister, he was as angry as she had ever seen him but that she did not know of any reason the victim would have had for wanting to kill the defendant.

Brandy George, the defendant's sister, testified that although she had heard of difficulties between the defendant and the victim, she had never personally witnessed any problems before the events in question. Ms. George testified that on the night of the murder, she arrived home about eleven after having gone out with her boyfriend, Chris Taylor. She said that the defendant arrived home before she went to bed and that she had a brief conversation with him. She said that after she went to bed, she received a telephone call from the victim, who wanted to speak to the defendant. She said she went to the defendant's room to tell him the victim was on the telephone but found him asleep. She said she returned to the telephone and told the victim that the defendant was asleep. She said only a few seconds after having ended the first telephone call, the victim called a second time and told her, "Go wake Jeremiah up right now." She said she went into the defendant's room and told him what the victim had said. She said the defendant told her to tell the victim that he was asleep. She said that when she again told the victim that the defendant was asleep, he retorted, "Tell him that I am going to break his f*****g neck." She said the second telephone call was the last one that she received. She said the defendant came to her room later that night to tell her that the victim had called again, telling the defendant that "it was war and that he was coming with a gun." She said that the defendant asked her to call friends for help and that she called her boyfriend.

Ms. George said that shortly after her brother came into her room, the victim arrived and began yelling for the defendant to come out of the house. She said she went outside to confront the victim on her porch. She said she asked the victim, "Is this over meth?" She said he responded, "No . . . Your brother owes me $40.00." She said that during this time, the victim was acting like he was going to hit her and that after she told the victim he was disrespecting her grandfather's house, he said, "f*** your grandpa, f*** you, Brandy, and f*** Jeremiah." She said the victim began taunting the defendant by walking up and down the porch and calling the defendant "a p***y." She said that while the defendant was taunting the victim, he again acted as if he were going to hit her. She said she then went inside, got forty dollars, returned, and gave the money to the victim. She said that after she gave the money to the victim, he did not leave but continued cursing at the defendant. She said that as she was going back inside, the victim began walking toward his truck. She said that as she returned inside, the defendant opened the door and shouted at the victim, "What is up now?" She said that the victim yelled something back at the defendant but that she could not hear what he said. She said that the victim and the defendant began yelling back and forth at each other, that the

victim threw a can of lighter fluid inside the home, and that the defendant reacted by going outside after the victim with a knife. She said that upon seeing the defendant go after the victim with a knife, she began screaming and ran outside to find the defendant and the victim lying on the ground, struggling for the knife. She said that she tried to break up the fight but that the defendant pushed her out of the way. She said that during the struggle, she witnessed the defendant repeatedly stab the victim. She said that upon seeing the defendant stab the victim, she began screaming again and that she heard someone asking for help. She said she ran inside and told her grandfather that one of the two men "was hurt real bad." She said that she returned outside and went over to the victim and that she thought he was still alive. She said that she then noticed the defendant coming back from the victim's truck with a gun and that he did not have the gun before going to the truck. She said the defendant walked over to her grandfather's trailer and fired the gun into its side. She said that she then told the defendant she thought the victim was still alive and that the defendant replied "he would take care of it." She said the defendant went back to the victim and stabbed him again a couple of times somewhere between his ear and the upper chest area, but she was not sure.

On cross-examination, Ms. George acknowledged that when the victim first arrived, he began beating loudly on her window. She said that while the victim was beating on the window, he was saying to the defendant, "Come on out you f*****g p***y. Come on out." She acknowledged that the victim was screaming constantly and "yelling at the top of his lungs" and that she had never before seen the victim act in such a manner. She said that she thought the victim had been drinking and using methamphetamine.

Warren County Sheriff's Department Investigator Marty McGinnis testified that he was called to the scene on the night in question and assigned to the case as the lead investigator. He said that when he arrived on the scene, the defendant had cleaned his hands, so no blood was apparent on his skin. He said he ordered the defendant transported to his office for an interview. He said that during the interview, the defendant said that he stabbed the victim because he was afraid the victim was going to shoot him. Investigator McGinnis said that the defendant first told him the victim had fired his gun into the trailer but that the defendant's version of events "was just impossible" given the physical evidence. Investigator McGinnis said that he confronted the defendant with the inconsistency between his statement and the physical evidence and that the defendant admitted staging the crime scene to reflect that the victim had fired his gun.

Dr. Thomas Deering, a forensic pathologist and medical examiner, testified that he performed the autopsy on the victim. He said the victim died of "multiple knife stab wounds." He said the autopsy revealed the presence of nineteen wounds, which he concluded were the result of the victim having been stabbed a total of fifteen times. Dr. Deering said that the victim could have survived some of the stab wounds but that others were fatal. Dr. Deering said that one wound severed the jugular vein and two others severed the cervical spinal cord. He said these wounds were "in and of themselves fatal." He said that still other wounds punctured the victim's right lung and that they were "definitely fatal wounds." Dr. Deering said that in his opinion, two of the fatal wounds were inflicted while the victim was lying on his stomach and that one wound, which he opined was not

fatal, was inflicted immediately after or simultaneously to the victim's death. He said, however, that in his opinion, all of the fatal wounds were inflicted while the victim was still alive.

Dr. Deering also testified that during the medical examination he found a pair of brass knuckles in the victim's pants. He said that in his opinion, some of the victim's wounds, which were not inflicted by the knife, were consistent with having been inflicted by brass knuckles. Specifically, he noted that a group of lacerations on the victim's face were consistent with the defendant having worn brass knuckles when striking the victim. He acknowledged, however, that the wounds were also consistent with the victim being struck by a fist devoid of brass knuckles. This concluded the state's proof.[1]

The defense called Brent Breedlove who testified that he was at the victim's house on the night of the murder with his girlfriend, Tina Ledbetter, and that he overheard the victim speaking with the defendant's sister on the telephone. Mr. Breedlove said that the victim told the defendant's sister, "I am going to come and we are going to straighten this out." He said he understood the victim to mean that he was going to "whip Jeremiah." He said that the victim had been involved in a gun battle where the victim and a driver of another car got into an argument at a stop light, resulting in shots being fired by both the victim and the other driver. Mr. Breedlove said he was certain the defendant would have known about the shooting incident because the defendant was a better friend to the victim than he was. He said that when the victim left to go to the defendant's trailer, he had consumed between six and eight cans of Budweiser. Mr. Breedlove said that he wanted to go with the victim to keep the peace but that the victim would not allow him to do so. He said that both the victim and the defendant had been drinking and using methamphetamine earlier that night.

Paul Allen Smith testified that he drove the defendant to the victim's house, that he attended the party with the victim and the defendant, that he left with the defendant and drove him home, and that the victim called him sometime after he returned home. He said he did not speak with the victim, the victim spoke to him. He said the victim was upset when he called. He said the victim was shouting at him over the telephone. He said that the victim told him, "I am going to go over [to the defendant's house] and take care of it, and if I have to get a crew, I will come over there and take care of you too." Mr. Smith said he had no idea what the victim was talking about. He said he was surprised by the victim's telephone call because he did not know what it was about and because he did not know the victim very well. Mr. Smith said that shortly after the victim called him, the defendant called. He said the defendant told him, "Robert is on his way. You know he has always got a gun. He is coming out here and it is going down." He said the victim had a reputation for always carrying a gun. He said that when he was at the victim's house, the victim showed him "a Smith and Wesson 350 automatic" pistol. He said that shortly after receiving the call from the defendant, Brandy George called him asking him to come out and help. Mr. Smith said that because

---

[1]We note that in addition to these witnesses, the state also introduced the 9-1-1 tape and a taped conversation the defendant had with Paul Allen Smith and Chris Taylor while he was in jail awaiting trial. However, these exhibits are not included in the record on appeal.

of the frequency of the telephone calls, he initially thought they were intended as a joke, and therefore, he did not go to the aid of the defendant.

Chris Taylor testified that he is Brandy George's boyfriend, that they live together, and that she called him on the night in question and told him to come over to her house. He said she told him that the victim was on his way over and that there was going to be trouble. He said that she was upset and crying while he was talking to her. He said that as a result of the telephone call, he went over to her house and that when he arrived, the police were already on the scene.

Harold Bowdoin testified that he is the defendant's grandfather and that he was sleeping at home when the victim came over and started beating on the door. He said that Brandy George was frantic, that he tried to dial 9-1-1 but failed, and that the defendant helped him dial 9-1-1. He said that while the victim was outside making threats, he went to his bedroom to retrieve his shotgun because he thought somebody was breaking in but that he stopped because Brandy said that the victim was leaving. He said that about the time he returned to the area near the front door, a can of lighter fluid came flying into the house.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims the evidence is insufficient to support the jury's verdict. He contends that because he had a reasonable fear of imminent peril or death, he was justified in using deadly force. The state claims the evidence was sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See T.C.A. §§ 39-13-201, -210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Tennessee's self-defense statute, T.C.A. § 39-11-611(a), provides as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily

injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The state has the burden of negating any defense raised by supporting evidence. See T.C.A. § 39-11-201(a)(3).

In State v. Marcus Duvalle Hurston, No. W2000-01721-CCA-R3-CD, Madison County, slip op. 1-4 (Tenn. Crim. App. Aug. 13, 2001), app. denied (Tenn. Dec. 31, 2001), the defendant contended the evidence was insufficient based upon his claim of self-defense. In Hurston, the defendant encountered his ex-girlfriend and her then current boyfriend, resulting in mutual combat with the defendant repeatedly stabbing the unarmed victim. This court affirmed the defendant's conviction, holding that "In discounting the appellant's claim of self-defense, the jury may have concluded that the appellant was not justified in using a knife in self-defense. . . . Additionally, the jury may have concluded that the number of stab wounds indicates that the appellant was not acting in self-defense." Id. at 4 (internal citations omitted) (emphasis added).

In this case, the evidence, taken in a light most favorable to the state, showed that the victim came to the defendant's house late at night, that he was shouting obscenities at the defendant, that he was pounding on the defendant's door, and that he was acting in an aggressive manner to the defendant's sister. However, it also shows that the victim never entered nor tried to enter the defendant's home, that the victim retreated toward his truck after having received money from the defendant's sister, and that the defendant came out of the house after a can of lighter fluid was thrown inside, armed with a knife. We conclude that the jury could have found that the defendant was not justified in escalating the encounter with the victim by using a knife. The jury could also have discarded the defendant's self-defense claim based upon the number of stab wounds, fifteen, which the defendant inflicted upon the victim. Finally, while the victim lay bleeding profusely, the defendant went to the victim's truck, retrieved his gun, and attempted to stage the crime scene. Then, after the defendant's sister told him the victim may still be alive, the defendant retrieved the knife, went back to the victim, and stabbed him again. We conclude the evidence supports the jury's verdict of guilt.

## II. JURY INSTRUCTIONS

### A. Admission Against Interest

The defendant claims that the trial court's use of the term "admission against interest" was misleading and prejudicial, thereby entitling him to a new trial. He asserts that the statement "admission against interest" when given by a judge to the jury is essentially an improper commentary on the evidence. The state contends the defendant made statements against his interest, and therefore, the defendant has failed to show prejudice.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. The trial court must describe each element of an offense and define the element in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).

Our review of the relevant cases reveals none on point. However, we note that the defendant has cited secondary authority for the proposition that "the misleading term 'admission against interest' should be banned from courtrooms and appellate opinions." Neil P. Cohen, et al., Tennessee Law of Evidence, § 803(1.2).2 at 514 (3rd ed. 1995). While we agree that a trial court's use of this language may be problematic, the record before us does not reflect that the defendant was prejudiced by the trial court's use of the term "admission against interest" when instructing the jury. The defendant is not entitled to relief on this issue.

## B. Mens Rea Definitions

The defendant contends the trial court committed reversible error by failing to instruct the jury as to the definitions of intentional and knowing when instructing the jury on the lesser included offenses. The state claims this issue is without merit.

The record reflects that the trial court defined intentionally when instructing the jury on the elements of first degree murder. It also reflects that the trial court defined knowingly and intentionally when instructing the jury on the elements of second degree murder. However, when the trial court charged the jury on the elements of the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide, it stated,

> I have previously defined intentionally and knowingly for you, so I won't re-read those at this time. . . . Again, I previously read those definitions, so I won't do that again. . . . Again, I previously read those definitions. . . . Knowingly, intentionally, recklessly, and criminal negligence have been previously defined and they are included with each definition of each offense.

In State v. Cravens, 764 S.W.2d 754 (Tenn. 1989), our supreme court discussed an issue similar to that in the present case, stating,

> In our opinion, all of the elements of each offense should be described and defined in connection with that offense, although in [State v.] Martin[, 702 S.W.2d 560 (Tenn. 1985),] we did suggest that there could be cross-referencing or repetition in connection with the lesser offenses since jury instructions in felony cases are required by

> statute in this state to be written and physically delivered to the jurors
> for use in their deliberations.  Rule 30(c), T[enn]. R. Crim. P.

Id. at 756.  We conclude that the trial court's omission of the definitions of intentionally and knowingly for the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide was not error as it constituted permissible cross-referencing under Cravens.

### C.  Special Jury Instruction/"Mutual Combat"

The defendant next contends the trial court committed reversible error when instructing the jury by failing to include his requested "mutual combat" instruction.  The state claims that our supreme court abrogated the doctrine of "mutual combat" and that the trial court was correct in refusing the defendant's requested instruction.

In State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001), our supreme court held that the general assembly's revision of the criminal code in 1989

> abrogated the mutual combat doctrine.  The essence of the doctrine has been incorporated into the elements of the voluntary manslaughter statute.  The facts and circumstances surrounding a killing occasioned by mutual combat may establish that the defendant was impassioned as a result of adequate provocation.  Consequently, we hold that the trier of fact must consider all facts surrounding a killing, including the facts giving rise to an agreement to combat, to determine whether the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

We hold that under Williams, the trial court correctly refused the defendant's request for a special jury instruction of "mutual combat."  See also State v. Lakeisha Jones, No. W2000-02962-CCA-R3-CD, Haywood County (Tenn. Crim. App. Jan. 25, 2002), app. denied (Tenn. Sept. 23, 2002) (recognizing abrogation of "mutual combat" doctrine and holding trial court committed no error in failing to charge jury on "mutual combat").

## III.  INTRODUCTION OF PHOTOGRAPHS

The defendant contends that the trial court erred by allowing the state to introduce into evidence photographs depicting the medical examiner with a pair of brass knuckles on his hands next to a corresponding wound of the victim because the photographs were not probative of any issue in controversy and because whatever probative nature they may have had was substantially outweighed by the danger of unfair prejudice.  See Tenn. R. Evid. 401, 403.  The state claims the trial court

properly admitted the evidence because its probative nature was not substantially outweighed by prejudice. We agree with the state.

The admissibility of photographs is a matter committed to the sound discretion of the trial court and will not be overturned on appeal without a clear showing of abuse of that discretion. State v. Porterfield, 746 S.W.2d 441, 450 (Tenn. 1988). The leading case regarding the admissibility of photographs is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the admissibility of photographs of murder victims is within the discretion of the trial court after considering the relevance, probative value, and potential unfair prejudicial effect of such evidence. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. The probative value of the evidence must be weighed against any unfair prejudice the defendant will suffer in admitting the evidence, and only if the unfair prejudice substantially outweighs the probative value may the evidence be excluded. Id. at 951.

Evidence is relevant when it has any tendency to establish a fact, bearing on the outcome of the action, as more or less probable than without that evidence. Tenn. R. Evid. 401. Specifically, evidence can be relevant if it aids the testimony of the medical examiner. See State v. Bush, 942 S.W.2d 489, 515 (Tenn. 1997) (holding that photographs were relevant to supplement the testimony of the medical examiner and investigative officers in showing the cause of death and the violence of the attack); see also State v. Barnard, 899 S.W.2d 617, 623 (Tenn. Crim. App. 1994).

In the present case, the medical examiner used the photographs while he was testifying and discussed their potential relevance to the injuries he found when conducting the autopsy. The state introduced the photographs into evidence thereafter to supplement his testimony. The trial court did not abuse its discretion by admitting the photographs into evidence.

## IV. EXCESSIVE SENTENCE

Finally, the defendant contends that his sentence is excessive. He claims that the trial court erred in enhancing his sentence from twenty years, the presumptive minimum, to twenty-four years under both state law and the rule announced in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004). The state contends that the trial court properly sentenced the defendant under state law and that he has waived any Blakely argument by failing to raise it in the trial court. We hold that the trial court properly sentenced the defendant under state law and that while that trial court's enhancement of the defendant's sentence from twenty to twenty-four years violated the rule announced in Blakely, the constitutional error was harmless beyond a reasonable doubt.

At the sentencing hearing, Warren County Probation Officer Donna Dunlap testified that she prepared the defendant's presentence report. She said that the defendant declined the opportunity to give a statement concerning the death of the victim. She said she performed a background check on the defendant which revealed various misdemeanor convictions for driving on a revoked license, drug-related offenses, assault, and violation of probation. She said that it also revealed the presence

of an outstanding charge in Nevada against the defendant for "causing substantial bodily harm to another while driving, having a 0.1% alcohol level in the blood." She said that during the course of her investigation, the defendant stated that he "had more of a drinking problem than . . . a drug problem." She said that he told her he would drink excessively to the point that he would "get blown away" but that he only drank excessively on weekends.

Donna Robert testified that she was the victim's mother. She said that she wanted the court to sentence the defendant to the maximum term within the range, twenty-five years, because she felt that the defendant "has no feelings for anyone, whether it is an animal or human beings or anyone" and because the defendant "has never shown any remorse."

Jamie Webb testified that she wanted the court to sentence the defendant to life in prison but acknowledged that it could only sentence him to twenty-five years. She said that because of the defendant's killing her husband, she had suffered emotional problems which had resulted in her not being able to sleep, thereby requiring her to take tranquilizers. She said that her husband was her soul mate, that they had a good life together, and that they were meant to be together. She said that if the defendant were allowed back into society, he would kill again.

Karen Bowdoin George testified that she is the defendant's mother. She said that she did not raise the defendant right and that if she had raised the defendant right, he would have "turned out better." She said that she wanted the court to consider that the defendant was only twenty-seven, that the defendant was only protecting his grandfather and sister, and that the defendant would not have killed the victim without the victim's provoking him. She said that the defendant did not need to be in prison for the majority of his life because "he is not a violent person."

After hearing the witnesses' testimony and considering the presentence report, the trial court addressed the enhancement factors listed in T.C.A. § 40-35-114 and applied factors (2), that the defendant has a previous history of criminal convictions, (9), that the defendant has a previous history of unwillingness to comply with conditions of sentencing involving release into the community, and (10), that the defendant employed a deadly weapon during the commission of the offense. Based upon the existence of enhancement factors (2), (9), and (10), the trial court increased the defendant's sentence from twenty years, the presumptive minimum in the range, to twenty-five years, the maximum in the range.

The trial court next considered various factors in mitigation but concluded that even though the defendant may have initially acted with provocation, he ceased doing so when he returned and stabbed the victim again while the victim was lying helpless on the ground. Therefore, although the court found mitigation, it afforded it little weight, reducing the defendant's sentence from twenty-five to twenty-four years.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing

is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The range of punishment for a Range I defendant is fifteen to twenty-five years for a Class A felony. T.C.A. § 40-35-112(a)(1). Unless there are enhancement factors present, the presumptive sentence to be imposed is the midpoint in the range for a Class A felony. T.C.A. § 40-35-210(c). Our sentencing act provides that procedurally, the trial court is to increase the sentence within the range based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

Initially, we note the trial court complied with the purposes, principles, and procedures of the 1989 Sentencing Act. Therefore, we review the defendant's sentence de novo with a presumption of correctness. While the defendant's prior criminal record does not indicate a prior felony conviction, it does indicate that the defendant has a lengthy history of criminal convictions. The record also reflects that the defendant has violated the conditions of his probation three times. We conclude that the trial court's enhancement of the defendant's sentence from twenty years to twenty-

-11-

four years was justified. The defendant claims the trial court erred by not further reducing his sentence based upon the presence of mitigating factors, primarily the fact that he was acting under strong provocation and in self-defense. However, the defendant's argument fails to account for the fact that the trial court addressed why it afforded these factors little weight; namely, the fact that the defendant, after attempting to stage the crime scene and being told the victim was still alive, calmly and cooly retrieved the murder weapon and stabbed the victim again.

The defendant also asserts that the trial court violated his constitutional right to trial by jury when it enhanced his sentence based upon its application of certain factors, which were not found by a jury beyond a reasonable doubt or admitted by the defendant. Blakely specifies that other than prior convictions, any facts not reflected in the jury's verdict or admitted by the defendant which are used to increase a defendant's punishment above the presumptive sentence must be found by the jury, not the trial court. 524 U.S. at __, 124 S. Ct. at 2537. When the trial court enhanced the defendant's sentence by applying factors (9), that the defendant has a previous history of unwillingness to comply with conditions of sentencing involving release into the community, and (10), that the defendant employed a deadly weapon during the commission of the offense, it violated his right to trial by jury. However, this constitutional violation is subject to harmless error review. See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, White County, slip op. at 23-25 (Tenn. Crim. App. Nov. 30, 2004).

In applying factor (9), the trial court found that the defendant had failed to comply with conditions of a sentence involving release in the community. The presentence report indicates, and the record reflects, that the defendant had violated terms of probation on three separate occasions. The defendant did not contest this information reflected in the presentence report or the testimony of the probation officer. Further, the trial court's enhancement of the defendant's sentence for prior convictions was based solely upon the same evidence, the presentence report and the testimony of the probation officer. Given these circumstances, we conclude that the constitutional error in applying this factor was harmless beyond a reasonable doubt. See Arizona v. Fulminante, 499 U.S. 279, 309, 111 S. Ct. 1246 (1991).

In applying factor (10), the trial court found that the defendant used a deadly weapon during the commission of the offense. Based upon the evidence produced at trial, including the testimony of the medical examiner, we likewise conclude that this error was harmless beyond a reasonable doubt. Id. The defendant's sentence is proper.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-12-